# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KATHY BYRD HARRINGTON as Administrator of the Estate of WESLEY RANDOLPH HUNTER, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | 1:21CV744 |
| v. | ) ) ) | |
| SOUTHERN HEALTH PARTNERS, INC., KELLY CARLTON, KAREN RUSSELL, JASON AUTEN, in his individual capacity, A. M. PRICE, in his individual capacity, MICHAEL ROGERS, in his individual capacity, CABARRUS COUNTY SHERIFF'S DEPARTMENT, and CABARRUS COUNTY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Wesley Randolph Hunter died in his cell at Cabarrus County Jail on August 21, 2020, and Hunter's mother, Kathy Byrd Harrington ("Plaintiff"), as administrator of Hunter's estate, brought this action. (ECF No. 6.) Following this Court's Memorandum Opinion and Order on September 1, 2022, (ECF No. 42), addressing various motions to dismiss, the only claims remaining in this lawsuit are Plaintiff's North Carolina law claims for wrongful death by medical malpractice against Kelly Carlton, Southern Health Partners, Inc., Cabarrus County, and Cabarrus County Sheriff's Department, including a claim for punitive damages against all parties except Southern Health Partners, Inc.; and a claim against Southern Health Partners, Inc. arising under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference.

Now before the Court are five motions: Defendants Cabarrus County Sheriff's Department and Cabarrus County's Motion for Summary Judgment, (ECF No. 47); Defendant Kelly Carlton's Motion for Summary Judgment, (ECF No. 49); Defendant Southern Health Partners, Inc.'s Motion for Summary Judgment, (ECF No. 51); Defendants Southern Health Partners, Inc. and Kelly Carlton's Motion to Strike and Exclude Expert Testimony of David Manthey, M.D., and Robin Cunningham, MSN, RN, (ECF No. 53); and Plaintiff's Motion to Strike and Exclude Expert Testimony of William W. King, M.D., (ECF No. 62).

For the reasons stated herein, Defendants Cabarrus County Sheriff's Department and Cabarrus County's Motion for Summary Judgment, (ECF No. 47), will be granted; Defendant Kelly Carlton's Motion for Summary Judgment, (ECF No. 49), will be granted in part and denied in part; Defendant Southern Health Partners, Inc.'s Motion for Summary Judgment, (ECF No. 51), will be granted in part and denied in part; Defendants Southern Health Partners, Inc. and Kelly Carlton's Motion to Strike and Exclude, (ECF No. 53), will be granted in part and denied in part; and Plaintiff's Motion to Strike and Exclude, (ECF No. 62), will be denied.

## I.     BACKGROUND

On August 12, 2020, Wesley Hunter was placed into the Cabarrus County Jail on drug-related charges. (ECF Nos. 6 ¶ 20; 50-2 at 1–3.) Hunter's medical records from the Cabarrus County Jail show that during Hunter's intake into the jail, he disclosed that he had been exposed to COVID-19. (ECF No. 50-2 at 13, 16.) As a result, Hunter was placed in medical isolation. (*Id.* at 16.)

On August 13, 2020, nursing staff conducted a history and physical examination of Hunter. (*Id.* at 8–9, 16.) During this history and physical examination, Hunter disclosed that

2

he suffered from opioid addiction and was experiencing withdrawal symptoms. (*Id.* at 8–9, 18.) Hunter also reported that he suffered from hypertension. (*Id.* at 8–9.) A standing order was entered for Hunter to begin withdrawal monitoring, to receive blood pressure checks for five days, and to receive Tylenol for seven days. (*Id.* at 18.)

Around the days of August 14, 15, 16, and 17, 2020, Hunter reported multiple episodes of vomiting and diarrhea. Hunter's vital signs were recorded intermittently throughout this time. (*Id.* at 19–20, 23–24.)

On August 18, 2020, Hunter reported no withdrawal symptoms, and did not want his prescription of Tylenol. (*Id.* at 24.) Hunter was moved to a quarantine cell in general population on August 19, 2020. (*Id.* at 16, 20, 24.)

At around 8:30 a.m. on August 20, 2020, Hunter complained of dizziness and was helped to a chair by officers. (*Id.* at 16.) Hunter's color returned, and he went back to his cell. (*Id.*) Nurse Carlton educated Hunter on dehydration, and he stated that he would drink more water or juice. (*Id.*)

Later that day around 7:00 p.m., Hunter passed out in the shower, and Nurse Carlton was called by officers to examine Hunter. (*Id.*) Nurse Carlton administered an ammonia tablet, which revived him. (*Id.*) Hunter conversed with Nurse Carlton and stated that he recalled the conversation with Nurse Carlton on eating and drinking to prevent dehydration. (*Id.*) Nurse Carlton noted that Hunter was "alert and answering questions appropriately," and that Hunter was moved back to his cell. (*Id.*) Nurse Carlton also noted that Hunter's mattress was put on the floor, and Hunter laid on the mattress. (*Id.*) Nurse Carlton evaluated a small laceration to Hunter's chin. (*Id.*) Hunter stated that he would continue to eat and drink and "advised to alert medical [staff] if needed." (*Id.*)

3

The following day, August 21, 2020, at around 8:30 a.m., officers requested a medical check on Hunter.[1]  (*Id.* at 16–17.)  Upon entering Hunter's cell, Nurse Carlton saw Hunter lying on his left side with his head toward his bunk.  (*Id.*)  Hunter stated that he was having a hard time getting up and down, and Nurse Carlton advised him to keep his mattress on the floor if it helped.  (*Id.*)

Hunter confirmed to Nurse Carlton that he got up to eat breakfast, stated that he just "[wa]sn't feeling good."  (*Id.*)  Officers assisted Hunter to a sitting position, and Nurse Carlton recorded Hunter's vitals.  (*Id.*)  Nurse Carlton also recorded that Hunter drank three to four cups of water at this time without problem.  (*Id.*)  At this time, Hunter stated that he had a headache and asked for Tylenol; Nurse Carlton told Hunter that she could not give Tylenol at that time.  (*Id.*)  According to Nurse Carlton's deposition testimony, there was not any "extra medications on the cart" beyond what was already prescribed to be dispersed.  (ECF No. 50-3 at 109:9-14.)  Nurse Carlton's notes describe Hunter as "sitting up," with "skin intact" and skin color "appropriate."  (ECF No. 50-2 at 17.)  Besides the headache, Nurse Carlton noted that Hunter had no other complaints at the time.  (*Id.*)  Hunter's mattress was moved to the floor, he laid down, and Nurse Carlton again encouraged Hunter to eat and drink.  (*Id.*)  Nurse Carlton's notes provide that Hunter "verbalized understanding" to her recommendation.  (*Id.*)

---

[1] Plaintiff's opposition briefing and Complaint refer to this event as Hunter "experiencing a seizure." (ECF Nos. 6 ¶ 30; 61 at 3.)  However, Plaintiff does not point the Court to any evidence showing where an officer categorized this event as a seizure, let alone any evidence formally diagnosing this medical event as a seizure.  Plaintiffs' expert Dr. Manthey did not testify to this, (ECF No. 54-3 at 13:19–14:2), and Nurse Cunningham testified that her categorization of this event as a "seizure" was derived "from the deputy that told the nurse to come see [Hunter]" because he appeared to be having a seizure, (ECF No. 54-5 at 77:12-18), and acknowledged that the word "seizure" is not used in any of Hunter's medical documentation, (ECF No. 54-5 at 79:11-24).  Plaintiff does not dispute Nurse Carlton's description of events once arriving to Hunter's cell.

That same day, around 3:05 p.m., officers reported that Hunter was unresponsive and called Nurse Carlton to Hunter's cell. (*Id.*) Officers also contacted emergency medical services. (*Id.*) Around 3:15 p.m., first responders and EMS personnel arrived and took over chest compressions and assessment of Hunter. (*Id.*) The time of death was called for Hunter around 3:45 p.m. (*Id.*)

According to the autopsy report of Mecklenburg County Medical Examiner's Office, Hunter's cause of death was "Upper gastrointestinal hemorrhage due to Gastroesophageal junction laceration (Mallory-Weiss syndrome)." (*Id.* at 25.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Case 1:21-cv-00744-LCB-JEP   Document 69   Filed 05/11/23   Page 5 of 41

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

Before the Court addresses the three present motions for summary judgment, the Court will address the two motions to exclude expert testimony. (ECF Nos. 53 & 62.)

## III. MOTION TO EXCLUDE DR. MANTHEY & NURSE CUNNINGHAM

Defendants Southern Health Partners, Inc. and Nurse Kelly Carlton move to strike and exclude the expert testimony of David E. Manthey, M.D., and Robin Cunningham, MSN, RN, (ECF No. 53), specifically contending these medical providers are not qualified to testify about the applicable standard of care relevant to the Plaintiff's state law medical malpractice claims, (ECF No. 54 at 8).

Although the Court follows federal law for the procedural aspects of the case, North Carolina law governs the substantive aspects of the state law claims. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996). Compliance with the expert witness requirement "is

Case 1:21-cv-00744-LCB-JEP   Document 69   Filed 05/11/23   Page 6 of 41

a substantive element of a medical malpractice claim" under North Carolina law. *Lauer v. United States*, No. 12-CV-41, 2013 WL 566124, at *3 (W.D.N.C. Feb. 13, 2013). Thus, the Court must determine whether the purported expert testimony complies with North Carolina Rule of Evidence 702. *See, e.g.*, *Gunter v. S. Health Partners, Inc.*, No. 16-CV-262, 2021 WL 4255370, at *14 (M.D.N.C. Sept. 17, 2021); *Huntley v. Crisco*, No. 18-CV-744, 2020 WL 4926636, at *3 (M.D.N.C. Aug. 21, 2020); *Wood v. United States*, 209 F. Supp. 3d 835, 842 (M.D.N.C. 2016).

"In a medical malpractice action under North Carolina law, the plaintiff must show: (1) the applicable standard of care under N.C. Gen. Stat. § 90–21.12; (2) a breach of the standard of care; (3) proximate causation; and (4) damages." *Burk v. United States*, No. 10-CV-470, 2012 WL 1185011, at *2 (E.D.N.C. Apr. 9, 2012) (citing *Weatherford v. Glassman*, 500 S.E.2d 466, 468 (N.C. Ct. App. 1989)). The parties "must establish the relevant standard of care through expert testimony." *Id.* (quoting *Smith v. Whitmer*, 582 S.E.2d 669, 672 (N.C. Ct. App. 2003)).

An expert proffered to testify on the applicable standard of care under N.C. Gen. Stat. § 90-21.12 must qualify as an expert under North Carolina Rule of Evidence 702. *See Wood*, 209 F. Supp. 3d at 842. Under North Carolina Rule of Evidence 702(b), a witness does not qualify as a medical expert and shall not give testimony as to the appropriate standard of care unless (1) he or she is a licensed health care provider who specializes in the same or similar area of medicine; and (2) he or she has spent the majority of his professional time during the year previous to the date of the cause of action in active clinical practice or in the instruction of students at a health professional school or clinic. Rule 702(d) states that a physician who qualifies as a medical expert witness under Rule 702(b), and "who by reason of active clinical practice . . . has knowledge of the applicable standard of care for nurses . . . or other medical

7

support staff may give expert testimony in a medical malpractice action with respect to the standard of care of which he is knowledgeable" as it applies to nurses or other medical support staff. While "it is not necessary for the witness . . . to have actually practiced in the same community as the defendant," the expert "must demonstrate that he [or she] is familiar with the standard of care in the community where the injury occurred, or the standard of care in similar communities." *Gunter*, 2021 WL 4255370, at *15 (quoting *Billings v. Rosenstein*, 619 S.E.2d 922, 924 (N.C. Ct. App. 2005)).

There is no single method by which a medical expert must establish familiarity with a given community. *Id.* For example, "[b]ook and internet research 'may be [] perfectly acceptable,' . . . so long as the expert 'demonstrate[s] specific familiarity with and expresse[s] unequivocal opinions regarding the standard of care.'" *Id.* (quoting *Crocker v. Roethling*, 675 S.E.2d 625, 630 (N.C. 2009)).

Moreover, lack of familiarity with a specific community does not necessarily render a medical expert unqualified to provide standard-of-care testimony. *See Haney v. Alexander*, 323 S.E.2d 430, 434 (N.C. Ct. App. 1984). North Carolina courts have held that "where the standard of care is the same across the country, an expert witness familiar with that standard may testify despite his lack of familiarity with the defendant's community." *Huntley*, 2020 WL 4926636, at *4 (quoting *Haney*, 323 S.E.2d at 434).

For example, in *Haney v. Alexander*, the North Carolina Court of Appeals recognized that there are certain uniform procedures to which a national standard may apply. 323 S.E.2d at 434 (allowing expert to testify that "taking and reporting vital signs of a deteriorating patient was the same for nurses in accredited hospitals across the country"). Additionally, in *Page v. Wilson Memorial Hospital, Inc.*, 272 S.E.2d 8 (N.C. Ct. App. 1980), the North Carolina Court of

8

Appeals noted that there are certain nursing practices "so routine and uncomplicated" that the standard of care would not significantly differ between counties, *id.* at 10. For instance, the court found that "procedures dealing with a patient's use of a bedpan" were one of those clearly "routine and uncomplicated" practices where any standard of care would not differ by community. *Id.* at 10–11.

Notably, the court in *Page* drew from other cases which held the same but in the context of the closure of an incision, *Wiggins v. Piver*, 171 S.E.2d 393, 395–96 (N.C. 1970) ("Reason does not appear to the non-medically oriented mind why there should be any essential differences in the manner of closing an incision, whether performed in Jacksonville, Kinston, Goldsboro, Sanford, Lexington, Reidsville, Elkin, Mt. Airy, or any other similar community in North Carolina."), and the treatment of a gunshot wound, *Rucker v. High Point Mem'l Hosp., Inc.*, 206 S.E.2d 196, 201 (N.C. 1974) (finding it was error to exclude doctor who testified that he was "familiar with fully accredited hospitals and the standards and practices of such hospitals are essentially the same throughout the United States in the treatment of gunshot wounds").

In contrast, in *Henry v. Southeastern OB-GYN Associates, P.A.*, 550 S.E.2d 245 (N.C. Ct. App.), *aff'd*, 557 S.E.2d 530 (N.C. 2001), the North Carolina Court of Appeals rejected the plaintiffs' universal standard-of-care argument and held an expert's testimony was properly excluded, *id.* at 248. There, the plaintiffs offered a single expert witness, an obstetrician practicing in South Carolina, in support of their malpractice action against an obstetrician located in Wilmington, North Carolina. *Id.* at 246. That expert "failed to testify in any instance that he was familiar with the standard of care in Wilmington or similar communities" but testified that he was "familiar with the national standard of care." *Id.* The court found that

9

because there was "no evidence that the national standard of care is the standard practiced in Wilmington," the testimony was properly excluded. *Id.* at 247. Similarly, in *Smith v. Whitmer*, 582 S.E.2d 669 (N.C. Ct. App. 2003), the court held that an expert's standard-of-care testimony was properly excluded where he "stated that he was familiar with a uniform or national standard of care" for orthopedic surgeons, "there was no evidence that a national standard of care is the same standard of care practiced in defendants' community," *id.* at 673.

Defendants' motion concerns the testimony of two experts, Dr. Manthey and Nurse Cunningham, as it relates to their standard-of-care testimony. The Court will address each expert in turn.

### A.    Dr. Manthey

Dr. David E. Manthey has been an emergency room physician at Atrium Wake Forest Baptist Hospital since 1999. (ECF No. 54-3 at 4.) Prior to 1999, Dr. Manthey served in the Army. (*Id.*) Dr. Manthey has never practiced in a correctional setting, (*id.* at 26:13-15) and has never provided clinical care to an inmate in a jail or a prison, (*id.* at 30:24–31:2).

In his first expert report, Dr. Manthey offers the following opinions:

- The inmate suffered from repeat episodes of syncope with evidence of an injury.

- There is no evidence that various life-threatening causes of syncope were evaluated to include but not limited to cardiac dysrhythmia or GI bleeding.

- The inmate admitted to and was seen to drink fluids as directed without any improvement in symptoms.

- Orthostatic blood pressures were not taken despite inmate stating he could not stand without passing out.

(ECF No. 54-1 at 1.)

In his supplemental expert report, Dr. Manthey adds one additional opinion: "Had the patient received proper medical care, that it was more likely than not, to a reasonable degree

10

of medical certainty, that he would have survived the GI bleed and the rupture at the gastroesophageal junction." (ECF No. 54-2 at 3.)

In arriving at these opinions, Dr. Manthey states that he relied on Mr. Hunter's medical records from the jail, the autopsy report, and reports from the involved detention officers. (ECF No. 54-2 at 3.) In his deposition testimony, Dr. Manthey admits that he did not review Nurse Carlton's deposition, Cabarrus County's policies, Southern Health Partners' policies, or other general resources on correctional facility policies and procedures. (ECF No. 54-3 at 20:3-17, 24:4-9, 35:13-15, 65:1-3.)

Defendants argue that Dr. Manthey is not qualified to offer standard-of-care opinions under Rule 702(d) because he is "not knowledgeable about the standards of care that apply to licensed practical nurses employed by contracted health care companies in the same or similar types of correctional healthcare facilities situated in the same or similar communities as the Jail."[2] (ECF No. 54 at 8.) In addition to highlighting Dr. Manthey's lack of practice experience in a correctional setting, Defendants highlight the following deficiencies in Dr. Manthey's reports and testimony, including that he "failed to testify that he is familiar with the defendants' training, the defendants' experience, or the resources available in the defendants' particular community"; "admitted that he knew nothing about the Jail's medical facilities or resources"; "did not know how many patients were housed at the Jail"; "did not review the deposition of Nurse Carlton"; and "he did not review any medical policies or procedures in place at the Jail." (*Id.* at 10.) Thus, Defendants maintain that "[i]t is clear from Dr. Manthey's

---

[2] The Court notes that the parties concede Dr. Manthey satisfies North Carolina's Rule 702(b) requirement—that is, in the year immediately preceding Hunter's death, Dr. Manthey was a physician specializing in emergency medicine and was employed as a professor in the Department of Emergency Medicine at the Wake Forest School of Medicine. (ECF No. 54 at 3.) The focus of the challenge here is whether Dr. Manthey has established familiarity with the standard of care in the community where the injury occurred, or the standard of care in similar communities, as required by Rule 702(d).

11

deposition testimony that he has failed to establish any familiarity with the applicable standard of care [with respect] to Nurse Carlton or any nurse at the Jail and Cabarrus County." (*Id.* at 10–11.)

In opposing Defendants' motion, Plaintiff emphasizes that Dr. Manthey has testified in another case with similar facts, which shows his "familiar[ity] with a medical community similar to the jail in this case," as well as the fact that Dr. Manthey, as an emergency room physician, has treated inmates brought in by law enforcement. (ECF No. 55 at 9–10.) Plaintiff argues that "[b]y treating inmates who have been brought from their places of confinement in emergency circumstances, Dr. Manthey has gained particularly relevant familiarity with communities similar to the Defendants' community." (*Id.* at 10.) Plaintiff contends that Dr. Manthey has "crucial insight regarding the physician skill and training, facilities, and equipment that prisons and jails in communities similar to [Cabarrus County] . . . because if such jails had the requisite training, skill, facilities, and equipment to handle the medical needs of these inmates, those inmates would not have needed to be brought to Dr. Manthey's emergency room." (*Id.*)

Defendants counter that Dr. Manthey acknowledged "he did not 'remember much about the [prior] case'" and "could not remember if the inmate in the other case had died or if he even gave standard of care testimony in that case." (ECF No. 57 at 4.) Defendants also argue that Dr. Manthey "cannot testify as to any 'universal' standard of care for any such 'uniform' procedures, such as the taking of vital signs, in a correctional setting" because he "does not have experience providing care in a correctional setting, and his testimony shows that he does not have any familiarity with the provision of medical care in a correctional setting." (*Id.* at 5.)

12

First, it is notable to the Court that Dr. Manthey admittedly did not look into any details or specifics about the Cabarrus County Jail, including what type of medical services or providers were available at the jail, to any degree. Nor did he review the deposition of Nurse Carlton—whose conduct is squarely at issue in this matter. Dr. Manthey did not look into any of the medical policies, procedures, or protocols in place at the Cabarrus County Jail—let alone any general information about jails and their medical services. While Dr. Manthey may be well-qualified in other respects given his longtime role as an emergency room physician, that experience alone is insufficient to offer standard-of-care testimony in this case under North Carolina's Rule 702. While the Court acknowledges that "it is not necessary for the witness . . . to have actually practiced in the same community as the defendant," it is clear from both of Dr. Manthey's reports and testimony that he has not demonstrated specific familiarity with a medical community similar to the jail in this case and is not qualified to express unequivocal opinions regarding the standard of care in this instance.

Second, regarding his testimony in a prior jail-care case, the extent to what Dr. Manthey testified was, "I don't really know that it's exactly similar, other than both of them vomited blood and both of them were in prison." (ECF No. 54-3 at 6:14–7:18.) Dr. Manthey could not recall much else, stating he did not remember if he offered standard-of-care testimony in that case or how many years ago it was, and when pressed for more details repeatedly responded along the lines of: "I'm being honest with you. I don't remember the case." (*Id.* at 7:1-22.) The Court does not find this to be an adequate basis to admit standard-of-care testimony by Dr. Manthey in the present matter. Simply testifying in a previous case that the witness concedes he does not remember cannot support North Carolina's requirement that

Dr. Manthey establish familiarity with the standard of care applicable to Nurse Carlton or Southern Health Partners in the Cabarrus County Jail or similar communities.

Last, it is not apparent to the Court based on Dr. Manthey's deposition and reports that he purports to testify as to any uniform or national standard of care related to nursing or checking vitals. (ECF No. 55 at 12.) Dr. Manthey offers no opinions or testimony to that effect, nor does Plaintiff point the Court to any such evidence suggesting otherwise. Accordingly, this Court finds that the reports and testimony of Dr. Manthey as to the standard-of-care testimony applicable to Nurse Carlton must be excluded. Defendants' motion to exclude his expert testimony as it relates to the standard of care will be granted.[3]

## B. Nurse Cunningham

Nurse Robin Cunningham, MSN, RN, has been a full-time nursing educator at UNC Wilmington since 2013.[4] (ECF Nos. 54-4 at 5; 54-5 at 6:12-17.) In the several decades before 2013, she saw and treated patients in a clinical setting, in addition to holding various teaching positions. (ECF No. 54-4 at 5.) Like Dr. Manthey, Nurse Cunningham has never practiced in a correctional setting. (*See* ECF Nos. 54-4; 54-5 at 27:10–19.) In her deposition, Nurse Cunningham testified that in her current capacity as an instructor, she prepares students for nursing in a variety of environments. (ECF No. 54-5 at 27:23–28:3, 30:20-24.)

In her expert report, Nurse Cunningham provides opinions related to specific instances where she opines that Nurse Carlton breached the standard of care. For example, Nurse

---

[3] The Court notes that Defendants' motion is limited to Dr. Manthey's ability to testify as to the relevant the standard of care. To the extent Dr. Manthey offers any opinions unrelated to the standard of care, the Court withholds judgment.

[4] The parties concede Nurse Cunningham satisfies North Carolina's Rule 702(b) requirement—that is, in the year immediately preceding Hunter's death, she spent the majority of her professional time in the instruction of students at a health professional school or clinic.

Cunningham notes "a change in vital signs where [Hunter's] BP dropped from 138/84 (8-17-20) to 104/82"; how this "should have been recognized as an acute change and retaken within 1-2 hours"; that "[t]here was not follow up to reassess inmate and follow up on symptoms or vital signs until he passed out in the shower"; and ultimately "the nurse did not recognize the acuity of Mr. Hunter's condition. . . . [T]he nurse should know that if a patient is not stable they are not always capable to determine if they need medical help (as she documented) or able to summon help." (ECF No. 54-4 at 1.)

Nurse Cunningham also opines that "[Nurse Carlton] should have sent Mr. Hunter for a medical evaluation with passing out, a day of dizziness complaints & being too weak to stand as well as a seizure the next morning"; and that "[t]here was a duty to report inmate's condition immediately, recognize the medical emergency and have him evaluated." (*Id.*) She further provides the opinion that "[i]t is below the standard to ask the patient if they want their BP checked. This nurse should know the need for a complete assessment and reassessments. She failed to recognize the severity of Mr. Hunter's situation and act within the standard to report this and transport him for medical care." (*Id.* at 2.)

In forming her opinions, Nurse Cunningham testified that she conducted certain independent research about the Cabarrus County Jail and had baseline familiarity with the staffing, (ECF No. 54-5 at 31:4–32:11), and the number of inmates at the jail, (*id.* at 31:6-9). Nurse Cunningham also testified that her opinions were informed by her review of certain policies and protocols applicable to the Cabarrus County Jail and Southern Health Partners. (*Id.* at 12:15–14:22.)

Nurse Cunningham also purports to testify as to a "uniform" standard of nursing care, specifically as it relates to taking and reporting vital signs. (ECF Nos. 55 at 12–13; 54-5 at

15

128:5-7.) For example, in Nurse Cunningham's deposition, she describes what she believes are standard considerations necessary in "basic nursing care," and further noting her belief that "it's [] incumbent upon the nurse to see the holistic patient" and "follow up on the vital signs." (ECF No. 54-5 at 117:2–119:13; *see also* 144:22-23 ("Nursing care though is nursing care."); 144:24–145:2 (answering "yes" to whether one must provide basic nursing care "without regard to location").) Plaintiffs thus contend that "even if this Court were to find that either of the Plaintiff's experts lacked the requisite familiarity with same or similar medical communities to the instant community, which is expressly denied, the experts are still qualified to testify as to the standard of care related to the above-described uniform procedure of basic taking, reporting, and assessing vital signs." (ECF No. 55 at 12–13.)

Defendants argue that Nurse Cunningham is not qualified to provide standard-of-care opinions under Rule 702(d) and emphasize her lack of correctional medicine experience, her lack of experience managing patients undergoing opiate withdrawal, and "limited understanding of the health care provided at the Jail." (ECF No. 54 at 12.) Defendants highlight Nurse Cunningham's lack of familiarity with more specific medical policies and protocols applicable to P.A. Russell, who was dismissed from this lawsuit, (ECF No. 42 at 16), as well as Nurse Cunningham's lack of familiarity of how medical care at Cabarrus County Jail was impacted by the COVID-19 pandemic, (ECF No. 54 at 13). As to Nurse Cunningham's testimony related to a uniform standard of nursing care, Defendants argue that "[b]ecause Ms. Cunningham has testified that she does not have experience providing care in a correctional setting, she cannot testify as to the standard of care for 'uniform' procedures in a correctional setting." (ECF No. 54 at 13.)

For the following reasons, the Court will permit Nurse Cunningham's expert testimony on the standard of care applicable to Nurse Carlton.

In offering her opinions as to whether Nurse Carlton breached the standard of care, Nurse Cunningham familiarized herself with certain details of the Cabarrus County Jail and reviewed certain policies and protocols applicable to the Cabarrus County Jail and Southern Health Partners providers. Thus, while Nurse Cunningham herself never practiced in Cabarrus County Jail, the Court finds that she has still demonstrated sufficient familiarity with the nursing standard of care at the facility based on her own research and review of relevant materials. *See, e.g.*, *Huntley*, 2020 WL 4926636, at *4 (finding that expert's review of a sheriff's policy manual, administrative documents and code concerning medical policies in correctional facilities, and discovery demonstrated the expert's familiarity with the standard of care in that community).

Second, as to the uniform standard of nursing Nurse Cunningham testifies to, the Court is not persuaded that Nurse Cunningham's lack of experience in a correctional setting renders her unable to testify as to certain "uniform procedures" related to taking and monitoring vital signs. *See, e.g.*, *Haney*, 323 S.E.2d at 434 (recognizing that "taking and reporting vital signs of a deteriorating patient was the same for nurses in accredited hospitals across the country"); *see also Gunter*, 2021 WL 4255370, at *18 (permitting testimony of a nurse who testified that "the standard of care would be the same for nurses throughout central North Carolina, whether they were working in a hospital, a nursing home, or a jail," despite not having practiced in a jail herself). While Nurse Cunningham's testimony is less direct in making the point that the standard would be the same throughout North Carolina, whether in a hospital, a nursing home, or a jail, the Court finds that she nonetheless demonstrated

sufficient knowledge of the relevant standard of care to be deemed an expert in the context of the basic nursing duties at issue here. Accordingly, the Court finds Nurse Cunningham qualified to offer the challenged standard-of-care testimony and denies Defendants' motion to exclude or strike her testimony.

## IV.     MOTION TO EXCLUDE DR. KING

Plaintiff's motion to exclude concerns the expert testimony of Dr. William W. King, a gastroenterologist, whom Defendants identify as providing opinions "limited to medical causation." (ECF No. 67 at 3.) Defendants explicitly note that Dr. King's opinions "do not include standard of care opinions. (*Id.*)

In Plaintiff's words, her

essential complaint is th[at] Dr. King suggested in his deposition, that inmates such as Hunter, are not entitled to receive the same degree of medical care as a non-incarcerated person. This is not the law and hopefully will never be the law. Therefore, Dr. King's opinions are not reliable and lack a valid connection to the pertinent inquiry.

(ECF No. 63 at 5.) Plaintiff maintains that "[f]or Dr. King to testify, he must first understand that inmates have a Constitutional right to adequate health care." (ECF No. 63 at 6.) Plaintiff points to a series of exchanges in Dr. King's deposition in which he repeatedly responds along the lines of "I don't know what the standard [of care] is for a jail"; "I don't know what's standard in a jail"; "Again, I think we've already discussed this. I don't know what's standard in a jail."; and "I think it's fair to say that I don't practice medicine in a jail, so I don't know what's typical in a jail, I keep saying that." (ECF No. 63 at 9–11.) Plaintiff explains that "[t]he point of all of these excerpts is that with all of the symptoms that [] Hunter experienced, he was at least entitled to be examined by a physician . . . . Dr. King cannot testify about causation, if he does not realize that inmates have a right to healthcare . . . ." (*Id.* at 11–12.)

Defendants respond that "at no point in Dr. King's deposition did he testify that jail inmates, such as Hunter, are not entitled to receive fundamental medical care," but "[r]ather, Dr. King consistently stated that he could not opine as to the standards or procedures for providing healthcare in a correctional setting such as the Jail." (ECF No. 67 at 9.) Defendants emphasize that Dr. King's opinions are limited to medical causation, noting some of his opinions such as "disagree[ment] with Plaintiff's conclusory statement that Hunter bled to death internally," "that it would be speculative to testify that Hunter, more likely than not, would be salvageable on August 21, 2020, if he had been sent to the emergency room on the morning of August 21, 2020." (ECF No. 67 at 4.)

The Court finds that Dr. King's testimony did not suggest that "inmates such as Hunter, are not entitled to receive the same degree of medical care as a non-incarcerated person." (ECF No. 63 at 5.) Further, Dr. King is not being offered to testify as to the standard of care, and Plaintiff's motion raises no credible challenge to the purported medical causation testimony he offers. Accordingly, Plaintiff's motion to exclude the expert testimony of Dr. King will be denied.

## V. NURSE CARLTON'S MOTION FOR SUMMARY JUDGMENT

Nurse Carlton moves for summary judgment on both of Plaintiff's claims against her, a claim for wrongful death caused by medical malpractice and a claim for punitive damages under North Carolina law. (ECF No. 50 at 2.) For the following reasons, the Court will grant in part and deny in part Nurse Carlton's motion. The motion will be denied as to Plaintiff's claim for wrongful death by medical malpractice and granted with respect to Plaintiff's claim for punitive damages.

### A. Medical Malpractice Claim

Nurse Carlton first argues that she is entitled to complete immunity for actions taken to provide health care services at Cabarrus County Jail during the COVID-19 pandemic under North Carolina's Emergency or Disaster Treatment Protection Act ("EDTPA"). (ECF No. 50 at 8.)

The purpose of the EDTPA is to "promote the public health, safety, and welfare . . . by broadly protecting the health care facilities and health care providers in [North Carolina] from liability that may result from treatment of individuals during the COVID-19 public health emergency under conditions resulting from circumstances associated with the COVID-19 public health emergency." N.C. Gen. Stat. § 90-21.131.

Health care facilities, providers, and entities are afforded immunity if the following three elements are satisfied:

> (1) the health care facility, provider, or entity "is arranging for or providing health care services during the period of the COVID-19 emergency declaration";
>
> (2) the arrangement or provision of health care services is impacted, directly or indirectly "[b]y a health care facility, health care provider, or entity's decisions or activities in response to or as a result of the COVID-19 pandemic" or "[b]y the decisions or activities, in response to or as a result of the COVID-19 pandemic, of a health care facility or entity where a health care provider provides health care services"; and
>
> (3) the health care facility, provider, or entity "is arranging for or providing health care services in good faith."

*Id.* § 90-21.133(a)(1)–(3).

Immunity "shall not apply if the harm or damages were caused by an act or omission constituting gross negligence, reckless misconduct, or intentional infliction of harm by the health care facility or health care provider providing health care services." *Id.* § 90-21.133(b). Additionally, "the acts, omissions, or decisions resulting from a resource or staffing shortage

20

shall not be considered to be gross negligence, reckless misconduct, or intentional infliction of harm." *Id.*

The parties do not dispute that the first element of EDPTA immunity is satisfied—the relevant time where Hunter was in Cabarrus County Jail fell within the COVID-19 emergency declaration in North Carolina. (*See* ECF Nos. 50 at 9; 61 at 9–13.) The core issue here is under the second element—whether Nurse Carlton's provision of health care services in this matter was impacted, directly or indirectly, by decisions or activities in response to or as a result of the COVID-19 pandemic.

Nurse Carlton argues that "the health care services provided to Hunter during this period were both directly and indirectly affected by decisions set in place at the Jail in direct response to the COVID-19 pandemic." (ECF No. 50 at 10.) She emphasizes how "Hunter was placed under medical quarantine due to his pre-booking exposure to an individual who tested positive for COVID-19" and how "medical care at the Jail, specifically the ability to send inmates to outside care providers and the emergency room at the local hospital, was drastically affected by COVID-19." (*Id.*)

Plaintiff, in response, argues that "[t]here is no evidence that Carlton's failures to treat Hunter were the result of decisions Carlton made . . . due to the COVID-19 pandemic" and that no evidence suggests that Nurse Carlton's alleged "failures of basic differential diagnosis and basic monitoring of vital signs have anything to do with COVID-19." (ECF No. 61 at 10, 12.) Plaintiff emphasizes how "Defendant has offered no evidence that any attempt was ever made to consult a physician or obtain emergency medical services for Mr. Hunter." (*Id.* at 13.)

For the following reasons, the Court finds that Defendant Carlton is not entitled to immunity from Plaintiff's claims under the EDTPA.[5]

Case law applying the EDTPA, unsurprisingly, is limited. In the Fourth Circuit, two district courts have addressed the EDTPA, albeit only at the motion to dismiss stage. *Lynch v. Citadel Elizabeth City, LLC*, No. 21-CV-48, 2022 WL 2707701 (E.D.N.C. July 12, 2022); *Hooker v. Citadel Salisbury LLC*, No. 21-CV-384, 2022 WL 1663421 (M.D.N.C. May 25, 2022). In *Lynch*, the court denied a nursing facility defendant's motion to dismiss based on EDTPA immunity given that "Plaintiff does not mention COVID-19 or any changes to [defendant's] operations or policies in the amended complaint." *Lynch*, 2022 WL 2707701, at *3. In *Hooker*, the court likewise denied the defendants' motion to dismiss because the plaintiffs' claims were premised on "understaffing that occurred before the onset of the COVID-19 emergency declaration," which made defendants' immunity argument "premature." *Hooker*, 2022 WL 1663421, at *4.

Here, Plaintiff's medical malpractice claim against Nurse Carlton does not appear to be premised on any conduct by Nurse Carlton taken "in response to or as a result of the COVID-19 pandemic." While it is undisputed that Hunter was initially placed in medical quarantine due to potential exposure to COVID-19, there is no evidence suggesting that the care ultimately provided by Nurse Carlton to Hunter—the conduct which is pertinent to Plaintiff's medical malpractice claim here—was directly or indirectly impacted by COVID-19. Plaintiff's claim rests upon Nurse Carlton's decisions and purported omissions made during her various interactions with Hunter including, but not limited to, allegations that she failed to properly

---

[5] Plaintiff also makes an argument that Nurse Carlton waived her EDTPA defense by failing to raise it in her pleadings. (ECF No. 61 at 7.) The Court need not address this argument because the Court finds that Nurse Carlton is not entitled to EDTPA immunity.

assess his condition, failed to provide necessary follow up, failed to consult with a physician, and failed to timely reassess and monitor Hunter. (ECF No. 6 ¶ 53.) Apart from the fact that Hunter was placed in a quarantine cell due to possible virus exposure, Nurse Carlton does not present evidence showing her literal provision of medical care, such as in the taking of vital signs and assessment of his symptoms, were at all impacted by COVID-19.

Further, even accepting that COVID-19 was putting additional stress on local emergency rooms, there is no evidence that this fact had any impact, direct or indirect, on the medical services provided by Nurse Carlton to Hunter which are at issue. As Plaintiff notes, "Defendant has offered no evidence that any attempt was ever made to consult a physician or obtain emergency medical services for Mr. Hunter." (ECF No. 61 at 13.) Nurse Carlton herself testified that she did not feel that calling another provider was necessary based on the symptoms Hunter was experiencing. (ECF No. 61-1 at 128:24–129:2 ("I can speak for every assessment that I did, . . . it was not necessary to contact a provider."), 131:21-22 ("[Y]ou do not have to see a provider for vomiting and diarrhea."), 132:5 ("[H]e did not need to see a provider.").) The Court declines to adopt the expansive reading of the EDTPA which Nurse Carlton urges. Accordingly, the Court does not find Nurse Carlton entitled to immunity under the EDTPA.

Nurse Carlton next argues that, even if she is not immune under the EDTPA, she is entitled to judgment on the malpractice claim against her because "Plaintiff has not proffered the testimony of any medical expert witnesses who are qualified to give testimony as to the standard of care applicable to Nurse Carlton," (ECF No. 50 at 12), nor can Plaintiff show "that Nurse Carlton's conduct in treating Hunter was a violation of any applicable standard of care," (*id.* at 13).

23

As addressed above in the Court's analysis of Defendants' motion to exclude Dr. Manthey and Nurse Cunningham's standard-of-care testimony, the Court declines to exclude Nurse Cunningham's testimony. *See supra* Section III.B. Accordingly, because Plaintiff has proffered testimony of at least one medical expert witness qualified to give testimony as to the standard of care applicable to Nurse Carlton, summary judgment is not appropriate on those grounds. The only question that remains is whether a reasonable jury could find that Nurse Carlton violated the applicable standard of care.

Nurse Carlton argues that "she assessed and treated Hunter as clinically indicated by his observed and reported symptoms," and that the evidence shows "there was nothing from Hunter's medical records or vitals readings on August 20, 2020, and August 21, 2020 that would have warranted a call to [a physician or a physician's assistant] by Nurse Carlton." (ECF No. 50 at 13.) She contends that "Hunter's recorded symptoms spanning from August 19, 2020, to August 21, 2020 appeared to be symptoms of straightforward dehydration," which Nurse Carlton appropriately treated. (*Id.*) Nurse Carlton emphasizes that Plaintiff's expert Nurse Cunningham also "admitted that Hunter did have symptoms of dehydration and was suffering dehydration during the period at issue" and "no information given by Hunter or the detention officers . . . report[ed] blood in Hunter's stool or vomit." (*Id.* at 13–14.) Nurse Carlton maintains that Nurse Cunningham's "testimony affirms that the main symptom which would have alerted Nurse Carlton or any nurse at the Jail to Hunter's potential internal gastroesophageal tear and bleeding was never reported to any nurses at the Jail." (*Id.* at 14.)

In response, Plaintiff points to Nurse Cunningham's opinion that Nurse Carlton "should have sought a medical evaluation due to the passing out, reported dizziness, being too weak to stand, the [alleged] seizure the next morning, and the significant drop in blood

24

pressure." (ECF No. 61 at 15; *see also* ECF No. 61-9 at 1.) Plaintiff also notes the events on August 20, when Hunter informed Nurse Carlton of dizziness, was instructed to drink more, then subsequently passed out, and was again reminded to drink more and "alert medical if he needed further help," as evidence of breach of the standard of care. (ECF No. 61 at 15–16.) Plaintiff cites Nurse Cunningham's opinion that "this was another breach of the standard of care because Carlton should have recognized that Hunter was not stable and may not have been able to determine if he needed further medical help or able to summon medical help . . . ." (*Id.* at 16.) Additionally, according to Nurse Cunningham, that "Hunter was taking in water but still experiencing symptoms of passing out, dizziness, being unable to stand or sit up without passing out, falling in the shower, [allegedly] experiencing a seizure, and having extreme headaches," were "severe" symptoms and "not simply dehydration" which "warranted reporting immediately and sending [Hunter] out for further medical care." (*Id.*; *see generally* ECF No. 61-9.)

Based on the evidence before it, the Court finds there is a genuine dispute as to whether Nurse Carlton's breached the applicable standard of care, thus precluding the Court from granting summary judgment on Plaintiff's medical malpractice claim. While Plaintiff's expert concedes that Hunter exhibited symptoms consistent with dehydration and that Nurse Carlton did not observe symptoms such as blood in his vomit or stool that would be more clearly indicative of a gastroesophageal tear, (ECF No. 54-5 at 60:14–61:1), as outlined above, Plaintiff points to various alleged deficiencies with Nurse Carlton's treatment, such as her failure to act based on Hunter's drop in blood pressure, difficulty remaining conscious, extreme headaches, among other symptoms, (ECF No. 61 at 18), and her failure to understand the significance of his persistent symptoms, as well as her decision not to reassess her initial diagnosis of

dehydration, (*id.* at 17). For example, Nurse Cunningham opines how after Hunter "complained that every time he stood up he passes out and falls back down," it was "below the standard to ask [Hunter] if [he] want[ed] [his] BP checked," and that Nurse Carlton "should know the need for a complete assessment and reassessments" and "failed to recognize the severity of Mr. Hunter's situation and act within the standard to report this and transport him for medical care." (ECF No. 54-4 at 2.) Thus, the Court concludes, based on this evidence, that a genuine issue of material fact remains and that a reasonable factfinder could find that Nurse Carlton breached the applicable standard of care. Accordingly, Nurse Carlton's motion for summary judgment on the medical malpractice claim against her is denied.

### B. Punitive Damages Claim

As to Plaintiff's claim for punitive damages, Nurse Carlton argues that "Plaintiff has not established that Nurse Carlton is liable for compensatory damages under her claims of medical malpractice and wrongful death," and that even if she had, "Plaintiff has failed to show that Nurse Carlton knowingly, consciously, and deliberately placed Hunter at risk of harm by acting contrary to known protocols and procedures." (ECF No. 50 at 15–16.) Nurse Carlton maintains that because Plaintiff has failed to show any aggravating factors that accompanied Nurse Carlton's treatment, Plaintiff's claim for punitive damages should be dismissed. (*Id.* at 16.)

Punitive damages may be awarded in North Carolina only if the defendant (1) is liable for compensatory damages and (2) engaged in fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. § 1D-15(a). "'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." *Id.* § 1D-5(7); *see*

*also Cockerham-Ellerbee v. Town of Jonesville*, 660 S.E.2d 178, 180 (N.C. Ct. App. 2008) ("[A] wanton act is one done with a wicked purpose or . . . done needlessly, manifesting a reckless indifference to the rights of others, and an act is willful when there is a deliberate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the safety of the person or property of another." (internal quotations omitted)). "Willful or wanton conduct means more than gross negligence." N.C. Gen. Stat. § 1D-5(7). "In the medical context, a medical provider acts willfully and wantonly when she knowingly, consciously, and deliberately places a patient at risk of harm by acting contrary to known protocols and procedures." *Clarke v. Mikhail*, 779 S.E.2d 150, 160 (N.C. Ct. App. 2015).

While Plaintiff has withstood Nurse Carlton's motion for summary judgment on the claim of medical malpractice addressed above, the Court finds no evidence that Nurse Carlton "engaged in fraud, malice, or willful or wanton conduct" sufficient to warrant punitive damages under North Carolina law. Apart from the alleged deficiencies in Nurse Carlton's care outlined above, such as her failure to follow up on certain vital or reassess his condition, Plaintiff has not pointed to any aggravating conduct showing Nurse Carlton "knowingly, consciously, and deliberately placed Hunter at risk of harm by acting contrary to known protocols and procedures." Rather, Plaintiff reiterates arguments made opposing Nurse Carlton's motion to dismiss the underlying negligence claim and makes the conclusory statement that "Defendant Carlton's actions evince willful or wanton conduct because her actions and inaction . . . demonstrated a conscious disregard for the rights and safety of Hunter and subjected Hunter to insult and indignity." (ECF No. 61 at 19.) Plaintiff argues that "Carlton consciously disregarded Hunter's rights, safety, and dignity when . . . Carlton utterly refused to obtain any medical care for Hunter beyond waking him up and encouraging him to

27

drink water, refused to contact any physician or other medical provider regarding Hunter's condition, [and] refused to even attempt to obtain physician assessment." (*Id.*)

Plaintiff has not directed the Court to any facts in the record rising to the level of "conscious and intentional disregard of and indifference to the rights and safety of [Hunter]" necessary to sustain punitive damages under North Carolina law. The evidence shows that Nurse Carlton assessed and treated Hunter based on certain observed and reported symptom in a manner that she at least believed to be clinically appropriate. While it remains for a jury to decide whether Nurse Carlton's conduct in treating Hunter amounted to a breach of the standard of care, the Court does not find evidence of any blatant or intentional "refusal" by Nurse Carlton to treat Hunter. Nor does Plaintiff point to any specific protocols or procedures that Nurse Carlton acted contrary to. Plaintiff's claim for punitive damages against Nurse Carlton will therefore be dismissed.

## VI.    SOUTHERN HEALTH PARTNER'S MOTION FOR SUMMARY JUDGMENT

Southern Health Partners ("SHP") moves for summary judgment on both of Plaintiff's remaining claims against it, which include a claim under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference, and a claim for wrongful death caused by medical malpractice. (ECF Nos. 51 at 1; 52 at 2.) For the foregoing reasons, the Court will grant in part and deny in part SHP's motion. The motion will be granted with respect to Plaintiff's claim arising under § 1983; granted to the extent that Plaintiff's claim for wrongful death by medical malpractice is premised on direct corporate liability; and denied as to Plaintiff's claim for wrongful death by medical malpractice premised on vicarious liability of Nurse Carlton.

28

## A. Section 1983 Claim

SHP argues that "Plaintiff has not established that any policy or custom of SHP either caused deliberate indifference to Hunter's medical needs or caused a pattern of similar instances of deliberate indifference to other inmates," thus, "SHP is entitled to summary judgment and dismissal of Plaintiff's remaining § 1983 claim." (ECF No. 52 at 14.) For the following reasons, the Court agrees.

The Fourth Circuit has held that the principles of municipal liability under § 1983, as articulated in *Monell* and its progeny, apply equally to private corporations. *Austin v. Paramount Parks, Inc.*, 195 F.3d. 715, 727–28 (4th Cir. 1999); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). "[A] private corporation [may be] liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.* at 728. An official policy "may be found in written ordinances and regulations," "in certain affirmative decisions of individual policymaking officials," "or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). A "custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691).

The Fourth Circuit has made clear that "liability will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" *Id.* (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)). Further, a "policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of

isolated constitutional deprivations by municipal employees." *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984).

Plaintiff premises her claim on the alleged "widespread custom or policy of SHP with respect to medical treatment of inmates at the Cabarrus County Jail . . . to allow nurses, including LPNs, to diagnose inmates, prescribe medication, and administer medication to inmates without inmates ever seeing a doctor or physician's assistant." (ECF No. 58 at 15–16.) Plaintiff emphasizes the limited time that Karen Russell, a physician's assistant employed as the Medical Director for SHP at the Cabarrus County Jail, spent at the Jail, and SHP's guidelines that "allowed nurses to make diagnoses, write prescriptions, and issue medication without any assessment from a P.A. or M.D." (*Id.* at 16.) Plaintiff contends that under "SHP's widespread custom or policy, the physician's assistant assigned to the Cabarrus County Jail functioned essentially to rubber stamp the diagnoses and prescriptions written by the nurses." (*Id.* at 17.) It follows, according to Plaintiff, that this custom or policy "created an obvious likelihood that Hunter would suffer injury due to deliberate indifference to his serious medical need" in violation of his Eighth Amendment rights.[6] (*Id.* at 18.)

Here, it is clear to the Court that Plaintiff fails to present any evidence demonstrating a widespread policy or custom of deliberate indifference by SHP. To begin, Plaintiff does not present any evidence suggesting that SHP's policy allowing nurses to diagnose and prescribe medication to inmates prior to consultation with a physician's assistant was the cause of

---

[6] In conjunction with her custom or policy of deliberate indifference argument, Plaintiff also makes what appears to be a § 1983 argument against SHP under a theory of respondeat superior for acts of Nurse Carlton that allegedly constitute deliberate indifference in violation of Hunter's Eighth Amendment rights. (ECF No. 58 at 18–20.) However, as SHP notes, (ECF No. 65 at 8), this Court already dismissed such a claim. (ECF No. 42 at 13 ("Accordingly, to the extent that Plaintiff's § 1983 claim against Southern Health Partners is premised upon respondeat superior liability, the claim must and will be dismissed.").) Accordingly, the Court disregards Plaintiff's arguments to the extent they are premised on such a theory.

Case 1:21-cv-00744-LCB-JEP   Document 69   Filed 05/11/23   Page 30 of 41

Hunter's alleged deprivation of constitutional rights. Plaintiff's evidence focuses on the medical evaluation and treatment given to Hunter by Nurse Carlton, not that SHP's policy had some "specific deficiency. . . such as to make the specific violation almost bound to happen." Plaintiff's argument is entirely conclusory and claims that the policy to delegate certain tasks and duties within the Jail to nurses "created an obvious likelihood that Hunter would suffer injury due to deliberate indifference to his serious medical need." (ECF No. 58 at 17–18.) As mentioned above, Plaintiff improperly bases its § 1983 claim on the specific acts of Nurse Carlton in this isolated instance of Hunter's care, and the Court cannot infer any policy or custom giving rise to § 1983 liability merely from SHP's purported inaction in the face of isolated acts by its employees.

Thus, the Court finds that Plaintiff has not established any of the elements necessary to prove that SHP had a policy or widespread custom of deliberate indifference, and therefore SHP is entitled to summary judgment and dismissal of Plaintiff's remaining § 1983 claim.

## B.    Medical Malpractice Claim

Like Nurse Carlton, SHP also argues that it is entitled to complete immunity for actions taken to provide health care services at Cabarrus County Jail during the COVID-19 pandemic under North Carolina's EDTPA. (ECF No. 52 at 8–9.) SHP's argument is identical to that which Nurse Carlton makes. Thus, the Court's analysis above applies with equal force, and the Court accordingly does not find SHP immune under the EDTPA. *See supra* Section V.A.

SHP next argues that "[r]egardless of whether Plaintiff alleges her claim of medical malpractice under a claim of direct corporate liability or vicarious liability, Plaintiff has failed to demonstrate that SHP is liable under a claim of medical malpractice." (ECF No. 52 at 14.)

As SHP notes, Plaintiff does not specify whether her claim against SHP is for direct or vicarious liability. (*Id.*) However, based on Plaintiff's opposition briefing, it appears she pursues both, (ECF No. 58 at 20–22), and the Court addresses each theory of liability in turn.

### 1. Direct Corporate Liability

Just as with a medical malpractice claim against an individual healthcare provider, a plaintiff pursuing a claim against a corporate health care provider must establish: "(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." *Weatherford*, 500 S.E.2d at 468.

Additionally, North Carolina Rule of Evidence 702(h) specifies that where a medical malpractice claim is brought against a corporate health care provider like SHP,

> a person shall not give expert testimony on the appropriate standard of care as to administrative or other nonclinical issues unless the person has substantial knowledge, by virtue of his or her training and experience, about the standard of care among hospitals, or health care or medical facilities, of the same type as the hospital, or health care or medical facility, whose actions or inactions are the subject of the testimony situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

Plaintiff's argument supporting a direct corporate liability claim is sparse. Plaintiff not only fails to directly cite to evidence in the record in support of this claim, but her briefing is limited to conclusory statements like that "SHP was negligent as to its duty to make a reasonable effort to oversee and monitor physician treatment of a patient," as well as how "SHP's system of unsupervised nurse care proximately caused Hunter's injury because SHP caused the physician's assistant assigned to the Cabarrus County Jail to wrongfully delegate her duties to unsupervised nurses . . . ." (ECF No. 58 at 22.) As additional support, Plaintiff

points the Court to her arguments supporting her § 1983 claim of a custom or policy of deliberate indifference, which as discussed above, are not persuasive.

The Court finds that SHP is entitled to judgment as a matter of law on Plaintiff's medical malpractice claim premised on the direct corporate liability of SHP. Plaintiff has not presented any evidence through expert testimony that SHP violated a standard of care owed to Plaintiff. Neither Nurse Cunningham nor Dr. Manthey offered any opinion as to the standard of care applicable to SHP, let alone whether SHP's protocols and procedures used at Cabarrus County Jail breached that standard of care. Dr. Manthey explicitly stated that he would offer an opinion only as to whether Nurse Carlton breached the standard of care, (ECF No. 54-3 at 82:3-7), and Nurse Cunningham also failed to opine as any standard specific to SHP and focused on the specific nursing standard applicable to Nurse Carlton, (*see* ECF No. 54-5 at 117:10-18). Without evidence establishing the standard of care applicable to SHP, Plaintiff's claim must fail. Accordingly, the Court will grant SHP's motion for summary judgment on Plaintiff's medical malpractice claim to the extent that it is made against SHP directly.

Finally, the Court notes that in Plaintiff's Complaint, she appears to premise her claim, at least in part, on allegations that SHP was required to adhere to the standards set forth by the National Commission on Correctional Health Care ("NCCHC") and that SHP violated those standards in providing care to Hunter. (ECF No. 6 ¶¶ 55–59.). SHP bases part of its summary judgment motion on Plaintiff's "fail[ure] to provide any support for her allegations that SHP was required to adhere to NCCHC standards, that SHP somehow violated these standards, and that such violation of these standards caused some alleged harm to Hunter." (ECF No. 52 at 17.) SHP also notes how "neither of Plaintiff's experts gave any testimony

33

regarding familiarity or experience with NCCHC standards for correctional healthcare" or "opined on the applicability of NCCHC standards to the Jail in this case." (*Id.* at 17.) As SHP notes in its reply, (ECF No. 65 at 9–10), Plaintiff's response brief wholly fails to respond to this argument and presents no evidence supporting such allegations. The Court thus finds that any allegations by Plaintiff asserting that NCCHC standards are applicable, and that SHP violated such standards must be considered abandoned. *See Harris v. hhgregg, Inc.*, No. 11-CV-813, 2013 WL 1331166, at *4 (M.D.N.C. Mar. 29, 2013) ("When a party fails to respond to a summary judgment motion regarding a claim, the party essentially concedes that summary judgment in favor of the moving party is appropriate.").

        2.   <u>Vicarious Liability</u>

To support a theory of vicarious liability for an employee's or agent's actions, a plaintiff must show that (1) the agent's acts were expressly authorized by the principal; (2) the agent's acts were committed within the scope of her employment and in furtherance of the principal's business; or (3) the agent's acts were ratified by the principal. *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 235 (N.C. Ct. App. 1989). Here, there is no dispute that Nurse Carlton was employed by SHP and her treatment of Hunter fell within the scope of her employment and in furtherance of SHP's business. (ECF Nos. 52 at 18; 58 at 21.) Both parties direct the Court to their arguments regarding the individual medical malpractice action against Nurse Carlton. (ECF Nos. 52 at 18; 58 at 21–22.) Because the Court has already concluded that a genuine issue of material fact remains with respect to the medical malpractice claim against Nurse Carlton, and that a reasonable factfinder could find that Nurse Carlton breached the applicable standard of care, *see supra* Section V.A, the Court must deny SHP's motion for summary

judgment on Plaintiff's medical malpractice claim premised on the vicarious liability of Nurse

Carlton.

## VII. CABARRUS COUNTY SHERIFF'S DEPARTMENT AND CABARRUS COUNTY'S MOTION FOR SUMMARY JUDGMENT

Defendants Cabarrus County Sheriff's Department and Cabarrus County both move

for summary judgment on Plaintiff's remaining state law claims against them. (ECF Nos. 47;

48 at 4–5; 6 ¶¶ 52–70.) The Court will address the motion as it relates to each entity in turn.

### A. CABARRUS COUNTY SHERIFF'S DEPARTMENT

Cabarrus County Sheriff's Department (the "Sheriff's Department") argues that it is

not an entity subject to suit, as no North Carolina law authorizes suit against a sheriff's office.

(ECF No. 48 at 5–6.) Notably, Plaintiff's response brief does not address this argument by

the Sheriff's Department. Plaintiff addresses both the Sheriff's Department and Cabarrus

County jointly as "the County Defendants" and focuses on her argument that both

Defendants waived governmental immunity via the purchase of insurance. (ECF No. 56 at

5.)

In addition to finding the Plaintiff's failure to address this dispositive argument as

conceding that summary judgment in favor of the Sheriff's Department is appropriate, the

Court finds that the law in this area clearly prohibits Plaintiff's suit against the Sheriff's

Department.

In North Carolina, there is "no [] statute authorizing suit against a North Carolina

county's sheriff's department." *Parker v. Bladen County*, 583 F. Supp. 2d 736, 740 (E.D.N.C.

2008). Federal courts sitting in North Carolina have repeatedly held that North Carolina

sheriff's departments lack the capacity to be sued. *See, e.g.*, *Lowery v. Forsyth Cnty. Sheriff's Dep't*,

No. 20-CV-888, 2022 WL 939651, at *7 (M.D.N.C. Mar. 29, 2022) ("Accordingly, the Sheriff's

35

Office is not a legal entity subject to suit under the law of North Carolina." (internal quotations omitted)).

Accordingly, the Court finds that the Sheriff's Department lacks the capacity to be sued in North Carolina, and it is entitled to judgment as a matter of law on all of Plaintiff's claims against it.

### B.    CABARRUS COUNTY

Cabarrus County (the "County") argues that it is "is immune from Plaintiff's state law claims for negligence and punitive damages." (ECF No. 48 at 6.)  The County maintains that it was "engaged in a governmental activity or a proprietary activity related to the operation of the Jail" and that it did not waive governmental immunity by purchasing liability insurance. (*Id.* at 7–8.)

> As the North Carolina Court of Appeals has explained:
>
> In North Carolina the law on governmental immunity is clear.  In the absence of some statute that subjects them to liability, the state and its governmental subsidiaries are immune from tort liability when discharging a duty imposed for the public benefit.  Like cities, counties have governmental immunity when engaging in activity that is clearly governmental in nature and not proprietary. One cannot recover for personal injury against a government entity for negligent acts of agents or servants while they are engaged in government functions.  However, the county may waive its governmental immunity by purchasing liability insurance for specific claim amounts or certain actions.

*McIver v. Smith*, 518 S.E.2d 522, 524 (N.C. Ct. App. 1999) (citations omitted). It follows that, to succeed on its governmental immunity argument, the County must have been "engaging in activity that is clearly governmental in nature and not proprietary" and not have "waive[d] its governmental immunity by purchasing liability insurance for specific claim amounts or certain actions." *See id.*

In response to the County, Plaintiff first argues that the County's operations related to the Cabarrus County Jail are not clearly governmental in nature because "the County had a

36

duty to provide adequate medical care to Hunter" and it "fail[ed] to contract for the availability of a licensed physician in its agreement with SHP." (ECF No. 56 at 7.) Plaintiff also argues that the County's "refusal to provide statutorily required care for prisoners, including Hunter, was not in the interest of the public good" and that the County "received a proprietary and/or pecuniary benefit because it did not need to pay SHP or some other entity the additional costs of contracting a physician." (*Id.* at 8.)

Plaintiff's arguments on this issue are meritless. North Carolina courts have repeatedly affirmed that the operation of a jail is a governmental function. *See, e.g., Butterfield v. Gray*, 866 S.E.2d 296, 301 (N.C. Ct. App. 2021) ("Our courts have also long deemed the operation of a county jail to be a governmental function."). Plaintiff's tenuous argument about the County's "failure to contract for the availability of a licensed physician in its agreement with SHP" does not change the fact that the activity at issue here—that is, the operation of a county jail—is undoubtedly a governmental function.

Regarding the second issue of waiver, Plaintiff maintains that the County "waived governmental immunity by contractually requiring SHP to purchase professional liability insurance and by requiring SHP to name the County and Sheriff as an additional insured with respect to the policy." (ECF No. 56 at 6.) In support of her argument, Plaintiff attaches a "Health Services Agreement," (ECF No. 56-1), which states "SHP shall provide a certificate of insurance evidence . . . and shall name the Sheriff and County as an additional insured," (*id.* at 10). Plaintiff cites *Wood v. Guilford County*, 546 S.E.2d 641 (N.C. Ct. App. 2001) in support, arguing that *Wood* demonstrates that the County waived immunity because its contract with SHP required SHP to obtain a liability insurance policy and to name the County as an additional insured. (ECF No. 56 at 5–6.)

37

The County first counters that the evidence put forward by Plaintiff is only an "agreement to purchase insurance" which "does not equate to the actual purchase of insurance," noting that Plaintiff does not actually put forward SHP's insurance policy listing the County as an additional insured. (ECF No. 64 at 3.) In any event, the County maintains that "even if Defendant Cabarrus County is an additional insured on the policy purchased by Defendant SHP, examination of that policy reveals it does not operate to waive Defendant Cabarrus County's immunity." (*Id.*) The County cites the actual insurance agreement of SHP which states:

> In addition to the foregoing, the term "Insured" shall include any person or organization for whom the Named Insured is performing operations when the Named Insured and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on this Policy; provided, that each such person or organization is being afforded coverage under this Policy for any liability incurred solely as a result of the acts, errors or omissions of the original Insured. *No coverage will be available under this Policy for any Claim based on or arising out of any actual or alleged independent or direct liability of any such person or organization.*

(*Id.* at 4; ECF No. 64-1 at 8 (emphasis added).)

The County contends that this provision clearly demonstrates that coverage under the policy exists only for "the acts, errors or omissions of the Named Insured"—that is, SHP—and the policy "does not provide coverage to Defendant Cabarrus County for 'any actual or alleged independent or direct liability.'" (ECF No. 64 at 5.)

The County also points to an endorsement which reads as follows:

> This Policy is not intended by the INSURED to waive its governmental immunity as allowed by North Carolina General Statutes Section 115C-42, Section 153A-435, Section 115D-24 or Section 160A-485, or any amendments thereof. Accordingly, subject to this Policy and the Specific Excess Limits of Insurance as stated in the Declarations, this Policy provides coverage only for OCCURRENCES or CLAIMS for which the defense of governmental immunity is clearly not applicable or for which, after the defense is asserted, a court of competent jurisdiction determines the defense of governmental

38

immunity not to be applicable. This Policy does not apply to any amount for which the INSURED would not be liable under applicable governmental or sovereign immunity but for the existence of this Policy.

(ECF No. 48-1 at 97.)

The Court agrees with the County. While *Wood* suggests that a waiver of immunity may occur where a contract mandates a third-party to obtain a liability insurance policy naming a county as an additional insured, the *Wood* court also notes that the "[p]urchase of insurance . . . waives the county's governmental immunity, *to the extent of insurance coverage*." 546 S.E.2d at 645 (emphasis added). No provision was raised in *Wood* limiting coverage to claims "for which the defense of governmental immunity is clearly not applicable" or carving out coverage for claims based on the "actual or alleged independent or direct liability of [an additional insured]." That fact makes *Wood* distinguishable from the facts at issue here. North Carolina courts have been clear that "[g]overnmental immunity is therefore not waived where the applicable liability insurance policy excludes a plaintiff's claim from coverage." *Butterfield*, 866 S.E.2d at 302; *see also, e.g., Patrick v. Wake Cnty. Dep't of Human Servs.*, 655 S.E.2d 920, 923 (N.C. Ct. App. 2008) (holding that language stating how the "policy is not intended by the insured to waive its governmental immunity" and that the "policy provides coverage only for occurrences or wrongful acts for which the defense of governmental immunity is clearly not applicable" did not waive governmental immunity).

Here, the policy endorsement's language is unambiguous: "this Policy provides coverage only for OCCURRENCES or CLAIMS for which the defense of governmental immunity is clearly not applicable . . . ." SHP's policy further indicates that "no coverage will be available . . . based on or arising out of any actual or alleged independent or direct liability of [the additional insured]." The Court finds that such language encompasses Plaintiff's claims

39

here, and the County cannot be found to have waived its governmental immunity. Accordingly, the Court finds that the County is entitled to judgment as a matter of law on all of Plaintiff's remaining claims against it.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant Southern Health Partners, Inc., and Defendant Kelly Carlton's Motion to Strike and Exclude Expert Testimony of David Manthey, M.D., and Robin Cunningham, MSN, RN, (ECF No. 53), will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, Defendants' motion to exclude Dr. Manthey's expert testimony as it relates to the standard of care will be **GRANTED**, and Defendants' motion to exclude Nurse Cunningham's expert testimony as it relates to the standard of care will be **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike and Exclude Expert Testimony of William W. King, M.D., (ECF No. 62), will be **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Cabarrus County Sheriff's Department and Cabarrus County's Motion for Summary Judgment, (ECF No. 47), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Kelly Carlton's Motion for Summary Judgment, (ECF No. 49), will be **GRANTED IN PART** and **DENIED IN PART**. The motion will be **DENIED** as to Plaintiff's claim for wrongful death by medical malpractice and **GRANTED** with respect to Plaintiff's claim for punitive damages.

**IT IS FURTHER ORDERED** that Defendant Southern Health Partners, Inc.'s Motion for Summary Judgment, (ECF No. 51), will be **GRANTED IN PART** and

**DENIED IN PART**. The motion will be **GRANTED** with respect to Plaintiff's claim arising under § 1983; will be **GRANTED** to the extent that Plaintiff's claim for wrongful death by medical malpractice is premised on the direct corporate liability of SHP; and will be **DENIED** with respect to Plaintiff's claim for wrongful death by medical malpractice against SHP premised on the vicarious liability of Nurse Carlton.

This, the 11th day of May 2023.

/s/ Loretta C. Biggs
United States District Judge